UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

ANTHONY LAMONT MOORE,

                Plaintiff,                    Case No. 2:15-cv-143

v.                                        Honorable R. Allan Edgar

KAREN PRUNICK, et al.,

                Defendants.

_____/

## OPINION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Defendants Trierweiler, Lamb, Kimsel, Bauman, Denman, Lancor, Rutter, Bonevelle, Lindemuth, CMS, Westcomb, Bonefeld, Carlson, and Jane and John Doe Nurses from this action. In addition, the Court will dismiss Plaintiff's due process claims against Defendants Lagina, Schram, and Semansky. The Court will further dismiss Plaintiff's Eighth Amendment claims against Defendants Scott, McTiver, and

Prunick.  Finally, the Court will serve the complaint against Defendants Semansky, Lagina, Prunick,

Schram, Rasmussen, Thomma, McTiver, and Scott with regard to Plaintiff's retaliation claims.

## Discussion

### I.    Factual allegations

Plaintiff Anthony Lamont Moore, a state prisoner currently confined at the Ojibway

Correctional Facility (OCF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against

Defendants Assistant Resident Unit Supervisor Karen Prunick, Assistant Resident Unit Supervisor

Unknown Schram, Assistant Resident Unit Supervisor Unknown Lancor, Assistant Resident Unit

Supervisor Unknown Denman, Resident Unit Manager Tammy Lindenmuth, Warden Catherine

Bauman, Inspector Unknown Rutter, Corrections Officer Unknown Rasmussen, Corrections Officer

Unknown Thomma, Corrections Officer Unknown Lagina, Corrections Officer Unknown Semansky,

Grievance Coordinator Unknown Trierweiler, Grievance Coordinator Unknown Bonevelle, Dr.

Unknown Bonefeld, Physician's Assistant Amy Westcomb, Nurse Unknown Carlson, Nurse

Unknown McTiver, Nurse Unknown Scott, Nurse John Kimsel, Nurse Patricia Lamb, CMS, and

Unknown Parties named as John and Jane Doe Nurses.  Plaintiff claims that Defendants were

employed at the Alger Maximum Correctional Facility (LMF) during the pertinent time period.

Plaintiff's complaint consists of 110 pages of narrative, and 156 pages of exhibits.

In his complaint, Plaintiff asserts that during 2013 and 2014, while he was confined at the Alger

Maximum Correctional Facility (LMF), the named Defendants engaged in a variety of misconduct

in violation of his rights under the First, Eighth and Fourteenth Amendments to the United States

Constitution, as well as under state law.

Plaintiff alleges that from October 4, 2013, until October 13, 2013, he sent numerous medical kites to CMS [Correctional Medical Services, now Corizon Correctional Healthcare], requesting medical care for symptoms of chest pain, coughing up blood, and blood in his stool. Plaintiff did not receive a response, so he filed a grievance, which was denied by Defendant Scott, who refused to look at video evidence on Plaintiff's behalf. Plaintiff later discovered that health care personnel logged in the electronic medical record that Plaintiff had been seen on October 8, 17, and 24 of 2013. Plaintiff claims that the only time he was actually seen by health care was on October 24, 2013. Plaintiff states that on October 8 and 17, 2013, he went to pick up medication for his acid reflux, at which time Defendant McTiver refused to examine Plaintiff and told him to send a kite regarding his complaints. Plaintiff explained that he had already done so, and Defendant McTiver told him to send another.

From October 14, 2013, to October 17, 2013, Plaintiff sought assistance from Defendant Prunick, who stated that Plaintiff was still alive and that he should kite medical. Plaintiff filed a grievance on Defendant Prunick. On October 17, 2013, Plaintiff had a family member call MDOC administration in Lansing regarding Plaintiff's inability to get health care. Administration called the prison and Plaintiff was seen by Defendant Westcomb on October 18, 2013. Defendant Westcomb told Plaintiff that a medication had been ordered for the blood in Plaintiff's stool. It turned out that this was Hydrocortisone Acetate Suppositories for hemorrhoids, which Plaintiff did not have. When Plaintiff asked why he was coughing up blood, Defendant Westcomb stated that she did not know. On October 19, 2013, Plaintiff picked up test cards to check for blood in his stool. On October 24, 2013, the test revealed that Plaintiff did have blood in his stool. Defendant Westcomb gave Plaintiff some hemorrhoid pads and told Plaintiff that he should be receiving the

Hydrocortisone Acetate Suppositories the next day.  Plaintiff asserts that Defendant Westcomb never performed any tests to determine the blood in his stool was the result of hemorrhoids.  Defendant Westcomb continued to ignore Plaintiff's complaints of chest pain and coughing up blood.

On October 26, 2013, Plaintiff sent a letter to Defendant Bonefeld explaining his symptoms and seeking assistance.  On October 28, 2013, a nurse gave Plaintiff Tylenol and scheduled him to see the doctor.  On October 31, 2013, Plaintiff was seen by Defendant Bonefeld, who diagnosed Plaintiff with bronchitis and hemoptysis and prescribed Azithromycin.  Defendant Bonefeld also gave Plaintiff a cup and told him to provide a sputum sample for testing.  During the month of October, Plaintiff's cell was shaken down numerous times.  Plaintiff states that this had not occurred prior to him writing grievances on health care.

On November 2, 2013, Plaintiff turned in his sputum sample.  On November 4, 2013, Plaintiff sent a letter to Defendant Bonefeld complaining of worsening pain in chest.  On November 5, 2013, Plaintiff found his property was all over the floor and his legal papers in the garbage can.  On November 6, 2013, Plaintiff was called out to provide another sputum sample because his first sample had been lost.  Plaintiff's cell was tossed on November 6, 2013, November 8, 2013, November 10, 2013, and November 13, 2013.  On November 9, 2013, Plaintiff found a homemade knife or shank planted in his cell.  Plaintiff believes this was planted to set him up on a misconduct charge.  Plaintiff wrote letters to Defendant Bonefeld on November 6, 2013, and November 10, 2013, seeking medical attention.  Plaintiff filed a grievance regarding the fact that he had still not gotten x-rays.  This grievance was denied at each level.

On November 15, 2013, Defendant Bonefeld met with Plaintiff and informed him that he had two types of bacteria in his body, which could cause death if left untreated.  These bacteria

were Klebsiella Oxytoca and Serratia Marcescen, and had been discovered after testing Plaintiff's sputum.  Defendant Bonefeld told Plaintiff that he was going to prescribe a strong antibiotic and pain medication, and order an x-ray.  On November 17, 2013, Plaintiff filed a grievance on Defendants Bonefeld and Westcomb, asserting malpractice because they had initially diagnosed him with hemorrhoids and bronchitis.  On November 18, 2013, Plaintiff received Ciprofloxacin HCL.

On November 22, 2013, Plaintiff sent a letter of complaint to Defendant Bauman, but received no response.  On November 25, 2013, Plaintiff sent a letter of complaint to the Ombudsman, but was told that there was nothing that could be done.  Plaintiff claims that Defendant Trierweiler interfered with Plaintiff's grievances by removing attachments.  Plaintiff's grievance was never processed by Defendant Trierweiler.  On November 28, 2013, Defendant Semansky told Plaintiff that he and Defendant Lagina had tossed Plaintiff's legal property in the garbage during cell shakedowns on numerous occasions.  When asked, Defendant Lagina told Plaintiff that he could not prove it.  On December 2, 2013, Plaintiff sent a letter to Defendant Trierweiler asking to add the names of Defendants Semansky and Lagina to the grievance that he had submitted on November 18, 2013.  Plaintiff also requested video from November 27, 2013, to December 1, 2013, as evidence of staff misconduct.  Plaintiff did not receive a response.

Plaintiff filed grievances on November 25 and 26 of 2013, but did not receive a response or a receipt.  On December 5, 2013, Plaintiff attempted to file an amended grievance regarding his November 18, 2013, grievance.  Plaintiff also resubmitted his November 25, 2013, grievance.  These grievances were not processed.  On December 9, 2013, Plaintiff resubmitted his December 5, 2013, grievance, but it was rejected by Defendant Trierweiler.  On December 10, 2013, Defendant Prunick refused to send out Plaintiff's legal mail, saying that she was busy.

Approximately two hours later, Plaintiff asked Defendant Prunick to mail out his legal mail, but she stated that she was still busy.  Defendant Prunick then told Plaintiff that he should not have written "that grievance," referring to a grievance that Plaintiff had filed on Defendant Prunick in October of 2013, for the denial of medical care.  Plaintiff filed a grievance regarding Defendant Prunick's refusal to send his mail, which was denied at step I by Defendant Schram.  However, Defendant Schram sent Plaintiff's legal mail out for him on December 10, 2013.

On December 11, 2013, Plaintiff sent a kite seeking medical attention and asserting that the "two types of bacteria" in his body had gotten worse.  Plaintiff received no response.  Plaintiff sent a second kite on December 16, 2013.  On December 17, 2013, Plaintiff reported to the desk to pick up his medications.  Plaintiff was the first to arrive, but Defendant McTiver told Plaintiff that because he was a whiner, he could go last.  When Plaintiff protested, Defendant McTiver told him that she was not going to give him his medication.  Plaintiff threatened to file a grievance and Defendant McTiver said, "there you go whining again."  Plaintiff filed a grievance on Defendant McTiver, which was denied at step I by Defendant Scott, who violated policy by failing to interview Plaintiff.  Defendants Lamb and Trierweiler also violated policy in their denial of the grievance at steps II and III.

On December 18, 2013, Plaintiff discovered that Defendant Semansky had been removed from the unit because of Plaintiff's complaints against him.  Plaintiff asserts that the fact that Plaintiff's grievance had been rejected shows that there was a cover up to protect Defendant Semansky.  Plaintiff filed a grievance regarding the lack of response to his medical kites and claims that Defendant Scott lied in denying the grievance at step I when he said that Plaintiff's chest x-ray was negative.  Plaintiff asserts that he never received a chest x-ray.  Defendant Scott told Plaintiff

that if he continued to file grievances on health care, he would make sure Plaintiff did not receive treatment and ended up in the hole.  Plaintiff filed a grievance on Defendant Scott, which was denied at each step by Defendants Kimsel, Lamb, and Trierweiler.

On December 26, 2013, Defendant Prunick again refused to send out Plaintiff's step III grievances.  Plaintiff's grievance regarding this conduct was improperly denied at each step.  On January 3, 2014, Plaintiff sent a medical kite regarding continued symptoms of pain, coughing up blood, and blood in his stool.  On January 7, 2014, Plaintiff was placed on call out, but was not seen by medical.  On January 8, 2014, Plaintiff received notice that x-rays would be done on January 16, 2014.

On January 9, 2014, Defendants Schram and Semansky told Plaintiff that he was not being accepted into the dog program because he filed grievances on staff.  Plaintiff filed a grievance regarding this incident.  Plaintiff had x-rays done on January 16, 2014, and kited medical seeking pain medication.  On January 18, 2014, Plaintiff was told he could not have medication until his x-rays came back.  On January 20, 2014, Defendant Bonefeld told Plaintiff that his x-rays showed no inflammation and that Plaintiff did not have bronchitis.  Plaintiff complained of coughing up blood and blood in stool, but Defendant Bonefeld said that there was nothing that could be done.  Plaintiff filed numerous grievances regarding this denial, but Defendants Bonevelle and Trierweiler refused to process them.

On March 5, 2014, Plaintiff filed a grievance on Defendant Bauman regarding the dog program.  Plaintiff claims that Defendant Denman responded to the grievance, which was a violation of policy because she was a subordinate of Defendant Bauman.  On March 25, 2014, Defendant Schram told Plaintiff that he would find a way to prevent Plaintiff from getting in the dog program

by setting Plaintiff up on a misconduct, the way that he had done in the past.  Plaintiff filed a grievance on Defendant Schram and Defendants Prunick and Bonevelle violated policy in handling the grievance.  Plaintiff then filed a grievance on Defendants Prunick and Bonevelle, which was improperly handled by Defendant Lancor.  Plaintiff sent numerous letters of complaint to Defendants Bauman and Rutter regarding the conduct of Defendant Schram.  However, no corrective action was taken.  Plaintiff alleges that when he filed grievances on Defendants Bauman and Rutter, Defendants Bonevelle and Prunick violated policy in their handling of the grievances.

On May 7, 2014, Plaintiff was in his prison cell preparing for his work assignment when Defendant Rasmussen ordered Plaintiff to come to the office, or he would sue Plaintiff.  This announcement was made over the PA system.  When Plaintiff arrived at the office, Defendant Prunick was laughing with Defendant Rasmussen.  Plaintiff filed a grievance regarding this incident, asserting harassment.  Plaintiff claims that Defendant Denman failed to interview him regarding this grievance.  On May 14, 2014, Defendants Lagina and Thomma tossed Plaintiff's cell and threw his property on the floor.  Plaintiff claims that this was done to retaliate against him for filing a grievance on Defendants Rasmussen and Prunick.

After Plaintiff saw Defendants Thomma and Rasmussen reading the grievance, he threatened to have his family call the State Police.  Five minutes after that threat, Plaintiff's cell was torn up and his property was all over the floor.  Defendant Lindemuth, who supervised Defendants Thomma and Rasmussen, refused to intervene on Plaintiff's behalf.  Plaintiff filed a grievance regarding this incident.  On May 20, 2014, Plaintiff discovered that people from the Legislative Ombudsman's office were in the unit, so Plaintiff told them about the misconduct of staff and gave them a letter documenting the misconduct.  On May 21, 2014, Defendant Prunick refused to send

out a step III grievance with her name on it.  On May 22, 2014, Plaintiff received a work report from Defendant Rasmussen accusing him of leaving his work assignment to talk to strangers on the unit. Plaintiff was accused of neglecting his work assignment, despite the fact that he had been waiting for the unit to open up at the time of the incident.  Plaintiff filed a grievance regarding the false work report.  On May 30, 2014, Defendant Prunick sent a mental health employee, Mrs. Rose, to speak to Plaintiff.  Defendant Prunick told Mrs. Rose that Plaintiff was paranoid and thought everyone was out to get him.  Plaintiff filed a grievance regarding Defendant Prunick's comments to Mrs. Rose.

On June 1, 2014, Plaintiff woke with severe pain in his chest.  When Plaintiff arrived at his job assignment, he told Defendant Lagina about his pain.  Defendant Lagina just laughed and walked away.  Plaintiff got his work area set up for lunch.  Plaintiff saw Defendant Carlson and complained of chest pain.  Defendant Carlson asked if Plaintiff had shortness of breath.  Plaintiff said that he did not, but that his chest hurt.  Defendant Carlson took Plaintiff's name and number and stated that she would be right back.  However, she never returned.  Later that morning, Plaintiff was called to the office where Defendant Lagina told him that he was fired because he had spoken to the nurse while on his job assignment.  Plaintiff states that he observed another prisoner do the same thing, but that the other prisoner did not get fired.

Later that afternoon, Plaintiff approached a Corrections Officer and asked to be seen by health care.  Health Care was subsequently contacted and a nurse gave Plaintiff some medication for acid reflux.  Plaintiff filed a grievance on Defendant Lagina, which was improperly handled and denied by Defendant Bauman.  On June 4, 2014, Plaintiff received a bad work report in the mail that had been written by Defendant Lagina.  The report asserted that Plaintiff had been bothering health

-9-

care staff while on a work assignment.  Plaintiff filed a grievance, but Defendant Denman lied in the step I response.  Plaintiff was not given a step II appeal form by Defendant Bonevelle.

On June 11, 2014, Plaintiff submitted a step I grievance on Defendants Carlson and Lagina for lying in response to Plaintiff's grievance regarding the loss of his job.  Plaintiff's grievance was denied at step I and Defendant Bonevelle refused to give him a step II appeal form. Plaintiff claims that all the Defendants conspired to cover up each other's unconstitutional acts in violation of Plaintiff's rights.

Plaintiff claims that Defendants conduct violated his rights under the First, Eighth, and Fourteenth Amendments, as well as under state law.  Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

II.   Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than

-10-

a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that Defendant Lagina violated his rights when he fired him from his job assignment for talking to Defendant Carlson. Plaintiff claims that Defendants Carlson, Denman, and Bauman covered up this misconduct by lying in response to Plaintiff's grievance. Plaintiff also claims that Defendants Schram and Semansky improperly prevented him from participating in the dog program. Plaintiff has failed to allege a violation of his constitutional right of due process under the Fourteenth Amendment.

Procedural due process claims require resolution of two questions:

[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972); the second examines

-11-

whether the procedures attendant upon that deprivation were constitutionally sufficient. *Hewitt v. Helms*, 459 U.S. at 472.

*Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908 (1989).

Generally speaking, a protected interest exists if the individual has a legitimate claim of entitlement to it. *Id.* at 460. The interests here at issue are whether Plaintiff, a prisoner, had an entitlement to continued prison employment in the absence of just cause for discharge and whether he was entitled to participate in the dog program. Plaintiff has no inherent constitutional right to rehabilitation, education, job assignments, or other programming. *See Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S. Ct. 2392, 2400 (1981); *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 279 n.9 (1976); *Newsom v. Norris*, 888 F.2d 371, 374-75 (6th Cir. 1989); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980).

Nor does state law create such an entitlement. Michigan's statutes and regulations give prison authorities complete discretion regarding programming assignments of prisoners. Michigan does not have statutes or administrative rules restricting the discretion of its prison administrators concerning such decisions. Under Michigan Department of Corrections regulations, prison authorities retain broad discretion regarding the assignment of prisoners to rehabilitative programs and work assignments. *See* MICH. DEP'T OF CORR., Policy Directives 05.01.100 and 05.02.110. Moreover, a violation of Michigan procedural law is a mere violation of state law which does not translate into a due process violation. *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S. Ct. 1954 (1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992).

-12-

Accordingly, since Plaintiff had no entitlement to or liberty interest in his job assignment or in the dog program, the Due Process Clause was not implicated by Plaintiff's termination, with or without cause, or by Defendants Schram and Semansky conduct in preventing him from participating in the dog program. Therefore, Plaintiff's due process claims against Defendants Lagina, Carlson, Denman, Bauman, Schram, and Semansky are properly dismissed.

Plaintiff appears to be claiming that all of the Defendants violated grievance policy by failing to properly investigate his claims, lying in response to his grievances, and by interfering with his ability to file grievances. Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process. Therefore, Plaintiff's claims regarding Defendants' failure to follow grievance policy are properly dismissed.

The Court notes that Plaintiff fails to make specific factual allegations against Defendants Trierweiler, Lamb, Kimsel, Bauman, Rutter, Lindemuth, Denman, Lancor, and

-13-

Bonevelle, other than his claim that they failed to conduct an investigation in response to his grievances and complaints. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Trierweiler, Lamb, Kimsel, Bauman, Rutter, Lindemuth, Denman, Lancor, and Bonevelle engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

Plaintiff claims that Defendants CMS, Scott, McTiver, Prunick, Westcomb, Bonefeld, Carlson, and Jane and John Doe Nurses violated his Eighth Amendment rights by failing to properly diagnose his condition for approximately one month, and by giving him ineffective medication during October of 2013. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide

-14-

such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

-15-

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th

Cir. 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

In this case, Plaintiff alleges that he first complained of chest pain, coughing up blood, and blood in his stool on October 4, 2013. Plaintiff was seen by health care on October 8 and 17 of 2013, and was given medication for acid reflux. On October 18, Defendant Westcomb told Plaintiff that a medication had been ordered to address the blood in Plaintiff's stool. On October 19, 2013, Plaintiff was given test cards to check for blood in his stool. On October 24, 2013, Plaintiff was told that blood had been found in his stool. Defendant Westcomb gave Plaintiff some hemorrhoid pads and told him that he would be receiving medicated suppositories. On October 28, 2013, a nurse gave Plaintiff Tylenol and scheduled him to see the doctor. On October 31, 2013, Plaintiff was seen by Defendant Bonefeld, who diagnosed Plaintiff with bronchitis and hemoptysis and prescribed Azithromycin. Defendant Bonefeld also gave Plaintiff a cup for a sputum sample.

On November 15, 2013, Defendant Bonefeld told Plaintiff that testing of his sputum revealed two types of bacteria, and that Plaintiff would be treated with a strong antibiotic and pain medication, and that he would be receiving an x-ray. On November 18, 2013, Plaintiff was given Ciprofloxacin HCL to treat his condition. On January 16, 2014, x-rays were done and Plaintiff kited asking for pain medication. Plaintiff was told that he could not have pain medication until his x-rays

-17-

came back.  On January 20, 2014, Defendant Bonefeld told Plaintiff that his x-rays showed no inflammation and that Plaintiff did not have bronchitis.  On June 1, 2014, Plaintiff woke with chest pain.  Plaintiff was given medication for acid reflux later that day.  At some point thereafter, Plaintiff was transferred to the Ojibway Correctional Facility.

In this case, it is clear from the allegations in Plaintiff's complaint, that he received a course of treatment for his symptoms, that appropriate tests were ordered, and that the cause of his infection was determined.  After the cause of Plaintiff's symptoms were discovered, his antibiotic was changed from Azithromycin to Ciprofloxacin HCL.  Plaintiff was subsequently given a chest x-ray, which showed no inflammation in his lungs.  As noted above, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, 1996 WL 627724, at *1.  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.  *Gabehart v. Chapleau*, 1997 WL 160322, at *2.  Therefore, Plaintiff's Eighth Amendment claims are properly dismissed.

Moreover, with regard to Defendant CMS, Plaintiff fails to allege any facts showing sufficient involvement with the underlying misconduct.  Even where a defendant is a private company, § 1983 requires a showing of individual involvement in a deprivation of rights.  *See Hetzel v. Swartz*, 909 F.Supp. 261 (M.D. Pa. 1995) (prisoner sued counselor and counselor's employer, and court held that prisoner must show that employee acted pursuant to a custom or policy to support claim against employer).  Plaintiff has failed to make such a showing.

Finally, the Court notes that Plaintiff's retaliation claims against Defendants Semansky, Lagina, Prunick, Schram, Rasmussen, Thomma, McTiver, and Scott are nonfrivolous and may not be dismissed on initial review.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that all claims against Defendants Trierweiler, Lamb, Kimsel, Bauman, Denman, Lancor, Rutter, Bonevelle, Lindemuth, CMS, Westcomb, Bonefeld, Carlson, and Jane and John Doe Nurses are properly dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). In addition, the Court will dismiss Plaintiff's due process claims against Defendants Lagina, Schram, and Semansky. The Court will further dismiss Plaintiff's Eighth Amendment claims against Defendants Scott, McTiver, and Prunick. Finally, the Court will serve the complaint against Defendants Semansky, Lagina, Prunick, Schram, Rasmussen, Thomma, McTiver, and Scott with regard to Plaintiff's retaliation claims.

An Order consistent with this Opinion will be entered.


Dated:   6/23/2016                                  /s/ R. Allan Edgar
                                                R. ALLAN EDGAR
                                                UNITED STATES DISTRICT JUDGE